Re **BASCOM FOOD PRODUCTS COR-PORATION and John A. Fressie**

v.

**REESE FINER FOODS, INC.,** John Beers, Gary Greenhouse, Jerry Kehe, Jerry Dorf, Carl McCraw and Norm Wine.

**Civ. A. No. 89–1138.**

United States District Court, D. New Jersey.

June 1, 1989.

Gerald Krovatin, Lowenstein, Sandler, Kohl, Fisher & Boylan, Roseland, N.J., and Jeffrey L. Kessler, Weil, Gotshal & Manges, New York City, for Plaintiffs Bascom Food Products Corp. and John A. Fressie.

Frank Holahan and Harwood Lloyd, Hackensack, N.J., and Jack L. Lahr, Foley & Lardner, Washington, D.C., for defendant Reese Finer Foods, Inc.

Raymond R. Wiss, Winne, Banta, Rizzi, Hetherington & Basralian, Hackensack, N.J., for defendants John E. Beers, Gary L. Greenhouse, Jerry Kehe and Carl G. McCraw.

Charles J. Walsh, Sills, Cummis, Zuckerman, Radin, Tischman, Epstein & Gross, Newark, N.J., for defendants Jerry Dorf and Norman L. Wine, Jr.

## OPINION AND ORDER

LECHNER, District Judge.

This matter is currently before the court on the application of John A. Fressie ("Fressie") and Bascom Food Products ("Bascom Food") (collectively the "plaintiffs"), for preliminary injunctive relief requiring certain affirmative action on the part of defendant Reese Finer Foods, Inc. ("Reese Foods") and several individual defendants (collectively the "defendants"). For the reasons that follow, plaintiffs' application for injunctive relief is granted.

*Facts* [1]

In short, this case involves two plaintiffs who are being denied access to a supply of

---

1. In addition to the Verified Complaint, filed on March 16, 1989 (the "Complaint"), several sub-

food products which they would like to distribute. Plaintiffs claim that defendants' collective refusal to sell them various food products constitutes at least two *per se* violations of the antitrust laws. As *per se* violations, it is claimed that the purported reasonableness of the defendants' selling restrictions should not even be considered by the court under the so called "rule of reason" analysis. Defendants, on the other hand, claim that because the selling restrictions do not constitute *per se* violations of the antitrust laws, the restrictions should be considered under the rule of reason. It is further claimed the restrictions should not be deemed anticompetitive because they promote "interbrand competition."

Fressie is the president and sole shareholder of Bascom Food. In addition, Fressie is a shareholder of defendant Reese Foods. From 1971 until June 23, 1988, Fressie served as president, chief executive officer and director of Reese Foods. From 1971 until January 31, 1989, Bascom Food performed various general management functions for Reese Foods. According to the Complaint, Bascom Food did virtually everything for Reese Foods including sourcing, purchasing, product development, financing of Reese Foods' working capital through lines of credit and pursuant to Fressie's personal guarantees, order entry, billing, bookkeeping and all other administrative functions. In addition, Bascom Food performed other functions for Reese Foods such as warehousing and manufacturing. Complaint, ¶¶ 17, 18.

As discussed below, Fressie's and Bascom Food's positions at Reese Foods have been terminated.[2] Certain of the individual defendants now control Reese Foods. These defendants have entered into a voting trust agreement, pursuant to which plaintiffs claim the defendants have garnered a controlling interest in Reese Foods for the purpose of enforcing anticompetitive restraints.[3]

missions—both legal and factual—have been filed in connection with plaintiffs' application for preliminary injunctive relief. These submissions, to the extent they are referred to herein, are identified as follows: Plaintiffs' Memorandum in Support of Application for Preliminary Injunctive Relief, filed March 31, 1989 ("Plaintiffs' Br.") (Plaintiffs' Br. supercedes a prior moving brief, filed March 16, 1989, which prior brief has been withdrawn); Affidavit of John A. Fressie, filed March 16, 1989 ("Fressie Aff."); Memorandum of Defendant Reese Finer Foods in Opposition to Plaintiffs' Motion for Preliminary Injunctive Relief, filed April 14, 1989 ("Defendants' Br."); Affidavit of John Beers, filed April 14, 1987 ("Beers Aff."); Affidavit of Vernon L. Hevner (previously filed in a related "state court action," defined below), filed April 14, 1989 ("Hevner Aff."); Plaintiffs' Reply Memorandum in Support of Their Motion for Preliminary Injunctive Relief, filed April 24, 1989 ("Plaintiffs' Reply Br."); Reply Affidavit of John A. Fressie, filed April 24, 1989 ("Fressie Reply Aff."); Certification of John E. Bennett, Esq., filed April 24, 1989 ("Bennett Cert."); Certification of Clifford Koons, filed April 24, 1989 ("Koons Cert."); Certification of Robert J. Castellani, filed April 24, 1989 ("Castellani Cert."); Certification of Leo A. Dick, filed April 24, 1989 ("Dick Cert."); Certification of Joseph Michael, filed April 24, 1989 ("Michael Cert."); Certification of John Beers, filed May 2, 1989 ("Beers Cert."); Certification of Harry Maims, filed May 2, 1989 ("Maims Cert."); Certification of Gary Greenhouse, filed May 2, 1989 ("Greenhouse Cert."); Certification of Norm Wine, Sr., filed May 2, 1989 ("Wine Cert."); Second Reply Certification of John A. Fressie, filed May 9, 1989 ("Fressie Reply Cert."); Affidavits of the following individual defendants (previously filed in the state court action), filed on May 22, 1989: Dorf, Kehe, Greenhouse, Wine and Beers (collectively, the "defendants' state court affidavits"); Letter Brief of Defendants, filed on May 23, 1989 ("Defendants' Letter Brief").

2. On September 30, 1988, in response to the termination, Bascom Food and Fressie filed an action against the present defendants in the Superior Court of New Jersey, Chancery Division, Bergen County, Docket No. C–17324–88E (the "state court action"), seeking damages for breach of Bascom Food's express or implied management contract, for breach of fiduciary duties and for other claims.

3. On the issue of how the voting trust was established, and why, various defendants stated in affidavits filed in the state court action:

Finally, after years of disenchantment with Fressie, I and other shareholder/distributors saw an opportunity to get someone to run Reese who would be accountable to the Reese shareholder/distributors.

A group of shareholder/distributors including Jerry Kehe, Gary Greenhouse, Lee Schultz and me (sic) consulted with counsel as to how best to proceed with the replacement of Fressie and the termination of the Reese–Bascom management relationship. The method chosen was a voting trust in which one person,

Reese Foods (previously known as "V.I. P. Foods") was incorporated in 1971 under the laws of Delaware. The founding members of Reese Foods, including Fressie, desired to create a buying and distribution cooperative composed of, and owned by, a group of specialty food distributors. Through the group's collective buying power it was contemplated Reese Foods would be able to purchase specialty food products at favorable prices, which would enable the members to better compete in the marketplace. Mains Cert., ¶ 2.

In many respects, Reese Foods appears to be more of conduit for, and of, the members of the purchasing cooperative than a stand alone entity. Reese Foods appears to have generated no actual profits for itself. Instead, it has sold specialty food products (mostly under its own private Reese Foods or Reese Foods-owned labels) to its shareholder/distributors at market discounts and with substantial cash rebates. Reese Foods has no plant and equipment, no hard assets, and no employees to speak of. According to the Complaint, Reese Foods is, in many respects, a "paper corporation"[4] consisting essentially of a distribution network of competing individuals (or their companies) with the right to sell Reese Foods products. Complaint, ¶ 14. Historically, Reese Foods has had retained earnings of approximately $30,000 to $50,000 annually. In addition to the market discounts on goods sold, Reese Foods has distributed over $7 million in cash rebates to its shareholder/distributors since 1972. *Id.*

The original concept of Reese Foods was to give each distributor the exclusive right to sell Reese Food products in his own geographic territory. Fressie Aff., p. 4. It is alleged the Reese Foods shareholders and distributors operate separate and independent companies at the same horizontal level of the specialty foods market, selling specialty foods to individual retail distributors.

Reese Foods currently sells private label brands of spices, seasonings, gourmet food items and other high-quality food products ("specialty food products") to approximately thirty distributors throughout the United States. Twenty of the distributors are presently shareholders of Reese Foods. At one time all distributors were shareholder/members of Reese Foods; today certain distributors have been selected who are not shareholders. The majority of distributors, however, continue to be shareholder/members of Reese Foods.

Reese Foods' distributors are, generally speaking, independently operated and are under no contractual obligation to purchase any products from Reese Foods. As indicated below, however, the original shareholders have had an affirmative obligation to sell Reese Foods products. Over the years, the number of individual products in the Reese Foods specialty food product line has grown substantially. On August 20, 1971 (when Fressie and three other specialty food distributors, Norm Wine, Sr., Harry Mains, and Jack Heffner, each invested a few hundred dollars in exchange for one share of stock in V.I.P.) each shareholder agreed he would purchase two hundred cases of popcorn salt which Bascom Food would manufacture and sell to V.I.P. and which V.I.P., in turn, would sell to each of the three individual shareholder/distributors. Since that time, Reese Foods has grown into a diverse specialty foods distributor, with revenues in 1988 of approximately $43 million.

Fressie has played a significant role in the growth of Reese Foods. He has allegedly created distinctive Reese Foods brand names and labels (including El Rio, Da Vinci, Ty Ling), as well as its art, advertising and packaging. He allegedly provided all of the financing for Reese Foods through lines of credit guaranteed by Bas-

---

the trustee of the trust, would vote the shares of all members.

*See* defendants' state court affidavits, ¶¶ 6–7.

**4.** At oral argument, counsel for defendants indicated Reese Foods was expanding its staff to some degree, the suggestion being that it was actually more than a paper corporation or conduit of the defendants. Reese Foods, however, continues to be owned entirely by a number of the distributors.

com Food and Fressie personally. Since 1971, with the popcorn salt and "cheezy-buttery" popcorn seasoning, Fressie developed new specialty food items and generated marketing interest among the shareholders. Reese Foods now has a product line of over five hundred items. Complaint, ¶ 22.

According to Fressie, "[i]n many other products such as smoked oysters, artichokes and capers, Reese is the dominant market factor." Fressie Reply Aff., ¶ 13. As a general matter, it is alleged that trade in specialty food products is a significant element of interstate commerce. Complaint, ¶ 9. The defendants, on the other hand, maintain that Reese Foods has neither monopoly position nor dominant market share in any of its markets. It is asserted that Reese Foods is price-competitive.

Da Vinci pasta, for example, allegedly competes with DiCecco and other pastas manufactured by Borden Co. which, according to trade reports, sells approximately eight hundred million pounds of pasta per year. Reese Foods sells seventeen million pounds of pasta per year. Defendants claim there are at least a dozen brands of pasta with which they compete. In addition, there are approximately thirty-five companies that belong to the National Pasta Association, a national association of pasta suppliers to the grocery market.[5] Beers Aff., ¶ 4.

Reese Foods' line of El Rio Mexican food products, according to the defendants, competes with many manufacturers including the Old El Paso brand, marketed by a division of Pet, Inc., and Oretega, La Preferida and Tio Sanchez brands. Defendants similarly argue that Reese Foods' Ty Line Oriental food line competes with Kikkoman, the China Bowl brand of Estee, as well as Ka–Me brand, a division of Shafer Clarke, Inc. Market share figures for these Mexican and Chinese food products were not supplied.

Fressie claims that Reese Foods, with $43 million in annual sales, is the largest specialty food company in the United States. Defendants dispute this, arguing that The Specialty Food/Knorr Division of CPC International and The Specialty Food Division of Heinz International are believed to be larger. Defendants further argue that the size of Reese Foods is not particularly relevant in light of the intensive product competition in the retail grocery store business. According to defendants, "[a]lthough Reese Foods has products in one or two categories that are especially popular," Reese Foods products generally are not the major brand in the particular product category. Beers Aff., ¶ 6.

There has not been adequate evidence offered to determine, on a product-by-product basis, whether Reese Foods dominates —or is a significant factor—in any particular submarket for specialty food products. Attached as Appendix A to this opinion is a listing of revenues earned by Reese Foods in a number of product lines.[6] While many of the revenue figures would not tend to suggest Reese Foods enjoys a dominant market position in various markets (although there appears to be at least some economic impact), it is not possible to assess the market position without determining the scope of the product market. Furthermore, it is not possible to determine whether the "product market" definitions (discussed *infra*) for many of the individual products are especially narrow because of uniqueness in the Reese Foods products.

A limited amount of evidence, primarily in the form of affidavits, has been offered which suggests that at least certain Reese

---

5. Beers estimates that the United States pasta market share is dominated by Borden with twenty-five percent, Hershey with eighteen percent, CPC Int. with fifteen percent, General Foods with eight percent and Quaker Oats with three percent. These "giants" in the food industry thus control sixty-nine percent of the retail pasta market. Beers Aff., ¶ 4.

6. The Reese Foods products which may well have a "market impact," particularly if these products are somewhat unique, include: artichokes (with 1988 sales of $3.7 million), certain kinds of fish (with 1988 sales of $5.3 million), various kinds of pasta (with aggregate 1988 sales of several million dollars) and various Mexican food products (with 1988 sales of several million dollars).

Foods products have narrow product market definitions. Clifford Koons, the vice president of purchasing for Grocers Specialty Company, stated that: "We try to substitute another specialty food lines, Fancifood from McLane Company. However, their product quality, packaging and product assortment is simply not comparable to Reese in our customers mind [sic]. We have lost business from customers who will not accept Fancifoods as a substitute for Reese." Koons Cert., ¶ 4.

Another food distributor has stated that: "There are no adequate substitutes available to me for some of the Reese product line, particularly Reese artichoke hearts and its cooking wines." Michael Cert., ¶ 3. As to the DaVinci pasta, a third specialty food distributor stated: "The packaging of their Da Vinci pasta, for example, has been particularly good and that product has obtained a significant foothold in the specialty foods market." Dick Cert., ¶ 5. Importantly, even certain of the defendants (Dorf, Kehe, Greenhouse and Wine) stated in affidavits in the state court action that: "As a distributor, I depend upon the timely and orderly supply of Reese products. Reese is my largest line of specialty food products." *Id.* at ¶ 11.

As indicated, Fressie was recently terminated from his management position at Reese Foods; the individual members of Reese Foods have elected defendant John Beers ("Beers") to be CEO,[7] apparently because Fressie was less responsive to the membership's will. According to the Complaint, Fressie was removed from Reese Foods because he refused to enforce unlawful restraints of trade, to the dissatisfaction of the defendants and other shareholders. It is alleged, for example, that from 1971 until the time of his termination as Reese Foods' president in 1988, Fressie received several complaints from Reese Foods shareholders and distributors of "unauthorized" sales of Reese Foods products by competing distributors in claimed territories. Fressie refused to prohibit these sales. Complaint, ¶ 29.

According to the defendants, Beers has unilaterally decided not to deal with Fressie as a distributor because he presented a variety of problems.[8] In an effort to undercut plaintiffs' argument that they were terminated for failure to enforce a particular distribution policy, defendants attempt to argue there never was an actual policy, but instead mere "brainstorming" about the possibility of enacting a policy. This suggestion, however, is belied by the fact that Reese Foods had been soliciting antitrust advice for a decade on the legality of the policy and also by a December 19, 1988 memorandum from Beers to the shareholders. That memorandum indicates that a formal policy is, and has been, in existence:

> The fact remains that Reese, under the anti-trust laws, has a legal right to put into place reasonable policies designed to promote the orderly marketing and dis-

7. In an effort to demonstrate his autonomy and independence from the shareholders who elected him, Beers states that: "There are no Reese shareholder votes or board of director actions required to confirm [his] authority to take actions in areas of [his] CEO authority and responsibility. This CEO authority is ensured by both a two-year employment contract and by a voting trust of a majority of Reese corporate stock supporting [Beers'] management." Beers Aff., ¶ 2.

8. Beers, as a justification of the decision to deny Fressie distributor status, contends, among other things, Fressie has a record of self dealing, Fressie sells a competitive line of products, Fressie would attempt to destroy the market position of Reese Foods, Fressie and Bascom Food are not full line specialty food distributors and Fressie has brought lawsuits against Reese Foods. Beers Aff., ¶ 10.

It is noted that the lawsuits referred to by Beers involve the refusal of Reese Foods to deal with Fressie. Accordingly, the lawsuits do not logically form a separate basis for the current refusal to deal. Moreover, on the issue of the degree to which Fressie, through malice or inability, might cause Reese Foods' market position damage in any way, Fressie has stated: "If, at the end of one year of free and open competition, Bascom is not buying and selling at least as much Reese product as the current lowest volume Reese distributor, I will surrender my Reese shares to the corporation for nothing." Fressie Reply Aff., ¶ 27. In light of the absence of persuasive support for Beers' flat accusations against Fressie and the foregoing representation, it does not appear as though Fressie presents any particular danger to Reese Foods; the justifications advanced by Beers appear to be pretextual.

tribution of its products. The original policy of Reese was to forbid the diversion of merchandise to non Reese distributors. Unfortunately, prior management never enforced the policy, however, the policy is still in effect and we're going to start enforcing it.[9]

Fressie, now removed from the management of Reese Foods, seeks to be a regular full line distributor of Reese Foods products and to compete in regions already covered by Reese Foods distributors. It is the refusal of Reese Foods (and the individual defendants) to deal with Fressie which gives rise to this lawsuit.[10] Fressie claims the refusal of the defendants to deal with him stems from a fear of competition from a distributor who intends to sell Reese Foods products to centralized retail warehouses, other distributors, and wholesale grocers at a lower price, rather than on the established "store to door" basis, as described below.

Fressie claims the defendants, in refusing to deal with him, are eliminating the competition he could bring to existing territories by selling Reese Food products through different channels. Defendants are allegedly enforcing a "store to door" sales policy which prohibits a distributor from selling directly to centralized warehouses of wholesale grocers or to the warehouses of large supermarket chains, except within the distributor's established territory. This excludes potential distributors like Bascom Food and Fressie, which for historical reasons do not have an agreed-upon territory, from competing in the specialty foods market. Fressie Aff., ¶¶ 19–21.

According to the defendants, Reese Foods depends on the success of its distributors and their promotion and marketing of Reese Foods products. To ensure distributors market Reese Foods products vigorously in their respective areas of distribution, each distributor is expected to concentrate its marketing efforts in a particular geographic area. To encourage such effort, the individual Reese Foods distributors are typically granted exclusive distributorships in their areas. Defendants claim that to prevent potential free-rider problems[11] and to ensure distributors achieve economies of scale and other efficiencies in their respective markets, Reese has actively discouraged transhipping to other distributors.

These are objectives (sought to be achieved through nonprice restraints)

**9.** A copy of this December 19, 1988 memorandum from Beers to the Reese Foods shareholders was supplied at oral argument by counsel to plaintiffs.

**10.** As indicated, Fressie has brought the state court action to redress his termination from management of Reese Foods.

The refusal by defendants to deal with Fressie as a Reese Foods distributor occurred for the first time in December of 1988. On December 23, 1988, Bascom Food ordered ten containers of Reese Foods' DaVinci pasta, at a cost of approximately $167,000. Bascom Food's order was confirmed by written purchase orders, # 5002–5011, dated December 27, 1988. On January 26, 1989, Bascom Food also purchased three thousand bundles of smoked oysters from other Reese Foods distributors for resale to the specialty foods retail market. By memorandum, dated January 27, 1989, defendant Beers on behalf of Reese Foods, demanded to know what Bascom Food intended to do with the DaVinci pasta. Defendants refused to fill the order until Fressie provided that information. By letter, dated February 17, 1989, Beers stated to Fressie: "Please be advised that effective March 20, 1989 Bascom Food Products, Inc. will be discontinued as a food service distributor."

**11.** In this context the term "free-rider" refers to a market imperfection which creates a disincentive for individual distributors to incur the costs of promoting a product and providing extensive service to the customer. Because another distributor might incur the expenses to promote the product and provide customer service, "free riders" are able to successfully sell the product, at a lesser cost, by enjoying the benefit of increased demand created by the efforts of others. Because of the free-rider effect, these services might not be provided by distributors in a purely competitive situation. *See* Posner, *Antitrust Policy and the Supreme Court: An Analysis of the Restricted Distribution, Horizontal Merger and Potential Competition Decisions*, 75 Columbia L.Rev. 282, 285 n. 13 (1975); P. Samuelson, Economics 506–507 (10th ed. 1976). The free-rider problem was invoked as a justification for certain territorial restrictions in the landmark decision of *Continental T.V., Inc. v. G.T.E. Sylvania, Inc.*, 433 U.S. 36, 55, 97 S.Ct. 2549, 2560, 53 L.Ed.2d 568 (1977), a case involving restraints in the context of vertical distribution arrangements.

which defendants consider justifiable in the context of *vertical* distribution arrangements. According to plaintiffs, however, the history of Reese Foods is replete with *horizontal* attempts by distributors and shareholders to prevent other distributors from selling Reese Food products in their claimed geographic territories. The defendants' restrictive shareholders' agreement allegedly limits the methods by which Reese Foods members may distribute specialty food products. Defendants are thus allegedly able to charge more for Reese Foods products than they could if they distributed to the central warehouses of the same retail outlets.

Fressie asserts that while the Bascom Food management contract with Reese Foods was in place, he "voluntarily refrained from exercising [his] equal rights as a Reese shareholder to distribute Reese products to the retail trade for [his] own account and looked instead to the management contract as [his] primary source of income from the Bascom–Reese relationship." Fressie Reply Cert., ¶ 1. With the termination of the management contract, however, he now seeks to exercise a right which he claims always existed under the shareholders agreement—the right of all Reese Foods shareholders to buy Reese Foods products and to sell them as active distributors. *Id.*

Defendants argue that, contrary to plaintiffs' assertions, shareholder status carries with it no vested right to purchase and resell Reese Foods products. They note that shareholders have been denied the opportunity to purchase Reese Foods products in the past.[12] It is further explained by defendants that, although Reese Foods was formed by distributors who received stock in return for their contributions of capital, "the informal connection between stock ownership and distributorship rights has broken down over the years." Beers Aff. ¶ 7. Since the 1980 decision not to require newly appointed distributors to become Reese Foods shareholders, new distributors of Reese Foods products have not been purchasers of Reese Foods stock. *Id.* Defendants argue that ownership of stock cannot imply a right to sell Reese Foods products, otherwise a distributor owning Reese Foods stock would be immune from being terminated. *Id.*

This argument, however, ignores the fact that the shareholder's agreement provides an affirmative obligation on the part of every shareholder to sell Reese Foods products. The unjustified refusal to sell Reese Foods products is a specific basis for Reese Foods to repurchase a member's stock. Fressie Reply Aff., ¶ 4. Moreover, Beers testified at a deposition that Reese Foods stock is "really more of a membership card

12. While plaintiffs argue stock ownership entitles the members of Reese Foods to sell Reese Foods products, there appears to be no dispute that termination of such rights may occur under certain defined circumstances which are set forth in the shareholders' agreement. In this connection, the stock of Irving Fien, a former shareholder/distributor, was repurchased by Reese Foods in 1976 because he was not selling a sufficient amount of Reese Food products to adequately support the Reese Foods product line. Inadequate sales is a specific ground set forth in the Reese Foods uniform shareholder agreement for repurchasing a shareholder's stock. When Fien reapplied to become a distributor in 1986, Reese Foods had decided to create contractual distributors, but not to issue any new shares of stock in the corporation. Fressie Reply Aff., ¶ 6.

The following observation was made by a long-time attorney for Reese Foods: "Until Reese's present exclusion of Fressie and Bascom, only three shareholders whose conduct transgressed the limitations imposed by the shareholder agreement had their right to purchase revoked and their shares repurchased by Reese. In each instance, the shareholder had violated the shareholder agreement by failing to sell a sufficient quantity of Reese products." Bennett Cert., ¶ 10.

Counsel for the defendants made an issue at oral argument of the fact that Reese Foods' former attorney has supplied evidence in support of plaintiffs' application for injunctive relief. After it was noted that any irregularities should be addressed now (rather than in connection with the inevitable appeal in this matter), all counsel for the defendants agreed that the evidence offered by Mr. Bennett (particularly his opinion that the distribution restraints constituted *per se* violations of the antitrust laws) was not critical to plaintiffs' present application. While the antitrust advice of counsel over a period of years might be relevant to the existence of a formal distribution policy, and notice to defendants of its possible illegality, such advice does not bear on the conclusions to be drawn in this matter.

to the Reese buying co-op as opposed to representing a stock that someone would buy for an investment." Beers Deposition at 69, 1. 15–19.

Plaintiffs argue that Reese Foods has never refused to sell products to a shareholder other than pursuant to a justification contained in the shareholders' agreement. It has never merely taken the position that shareholders have no right to distribute. Fressie Reply, ¶ 7. From the evidence which has been submitted, it appears stock ownership in the Reese Foods cooperative carried with it an expectation that the stockholder would be a Reese Foods distributor, absent a violation of the shareholders' agreement or some unique reason such as stockholder management duties to the cooperative. There appears to be no other reason why an entity or person would hold stock in the cooperative.

*Discussion*

Preliminary injunctive relief will not issue unless the applicant can establish: "(1) a reasonable probability of eventual success in the litigation and (2) that the movant will be irreparably injured *pendente lite* if relief is not granted." *In re Arthur Treacher's Franchisee Litigation*, 689 F.2d 1137, 1143 (3d Cir.1982).[13] The defendants have argued that, where the plaintiff is seeking a mandatory injunction, as opposed to a prohibitory injunction, the burden is greater because mandatory injunctions are generally disfavored. (Citing *Punnett v. Carter*, 621 F.2d 578 (3d Cir. 1980)).

In *Oburn v. Shapp*, 521 F.2d 142 (3d Cir.1975), the Third Circuit clarified the

meaning of "reasonable probability of success:"

> "[it] is not necessary that the moving party's right to a final decision after trial be wholly without doubt; rather, the burden is on the party seeking relief to make a *prima facie* case showing a reasonable probability that it will prevail on the merits."

*Id.* at 148. *See also Delaware Valley Transplant Program v. Coye*, 678 F.Supp. 479, 481–82 (D.N.J.1988) (discussion of plaintiff's probability of success with regard to the Commerce Clause of the United States Constitution, Art. 1, Sect. 8, cl. 3, and the threshold inquiry concerning the Commerce Clause claim); *Zeller Plastik, Koehn Grabner v. Joyce Molding*, 698 F.Supp. 1204, 1226–27 (D.N.J.1988) (patent case where plaintiff demonstrated likelihood of success on the merits in proving by a preponderance of the evidence that defendant infringed the patent).[14] In this case, for the reasons set forth below, plaintiffs have (at this stage) made their *prima facie* case.

In considering the irreparable nature of the injury which may result from denial of preliminary relief, consideration can be given to whether the plaintiff will get an early trial on the merits. *See N.W. Controls, Inc. v. Outboard Marine Corporation*, 317 F.Supp. 698 (D.Del.1970). In this case, although the parties have been engaging in discovery in a related state court action, there is some discovery yet to be conducted and preparation to be completed prior to going to trial in this matter. It is currently

13. Moreover, while the burden rests upon the moving party to make these two requisite showings, a district court "should take into account, when they are relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest." *Id.*

14. The standard of proof for preliminary injunction applications thus does not require conclusiveness. *In re Arthur Treacher's Franchisee Litigation*, 689 F.2d 1137 (3d Cir.1982). *See also Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.1979) (application must raise sufficiently serious questions going to the merits to make them a fair ground for litigation); *Hamilton Watch Co. v. Benrus Watch Co.*,

206 F.2d 738, 740 (2d Cir.1953) ("To justify a temporary injunction it is not necessary that the plaintiff's right to a final decision, after a trial, be absolutely certain, wholly without doubt.... it will ordinarily be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation.")

It has always been the rule that the movant bears the burden of persuasion to establish the situation meets the standard for a preliminary injunction, and must offer proof beyond the unverified allegations of the pleadings. *Arthur Treacher's, supra; Thermex Co. v. Lawson*, 25 F.Supp. 414 (E.D.Ill.1938).

anticipated this matter will go to trial in October, 1989.

In the Complaint plaintiffs allege various violations of section one the Sherman Act,[15] 15 U.S.C. § 1. Although section one of the Sherman Act literally bars any combination of persons or entities "in restraint of trade," *Arizona v. Maricopa County Medical Soc'y*, 457 U.S. 332, 344, 102 S.Ct. 2466, 2473, 73 L.Ed.2d 48 (1982); *United States v. Topco Associates, Inc.*, 405 U.S. 596, 606, 92 S.Ct. 1126, 1133, 31 L.Ed.2d 515 (1972), courts have interpreted the word "every" liberally and construed section one as precluding only those contracts or combinations which "unreasonably restrain competition." *Northern Pacific Railway v. United States*, 356 U.S. 1, 3–5, 78 S.Ct. 514, 517–18, 2 L.Ed.2d 545 (1958); *United States v. Joint Traffic Ass'n*, 171 U.S. 505, 19 S.Ct. 25, 43 L.Ed. 259 (1898). Accordingly, since *Standard Oil Co. of New Jersey v. United States*, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911), the Supreme Court has analyzed most restraints under the so-called "rule of reason," which requires a determination as to whether, under all the circumstances of the case, the restrictive practice imposes an unreasonable restraint on competition. *See Maricopa County Medical Soc'y*, 457 U.S. at 343, 102 S.Ct. at 2472.

On the issue of plaintiffs' likelihood of success on the merits, three primary issues are presented. First, a threshold issue exists concerning the existence of standing on the part of plaintiffs to bring this lawsuit. Second, an issue exists concerning the structure of Reese Foods and its relationship with the other defendants as well as with Fressie. Plaintiffs have relied on the fact that the relationship among the parties is horizontal in nature. The third issue is whether any of the types of practices conducted by the defendants should be considered an unreasonable restraint of trade under the *per se* rules of antitrust. The Supreme Court in *Northern Pacific, supra*, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958), explained the appropriateness of, and the need for, *per se* rules:

> "[T]here are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use. This principle of *per se* unreasonableness not only makes the type of restraints which are proscribed by the Sherman Act more certain to the benefit of everyone concerned, but it also avoids the necessity for an incredibly complicated and prolonged economic investigation into the entire history of the industry involved, as well as related industries, in an effort to determine at large whether a particular restraint has been unreasonable—an inquiry so often wholly fruitless when undertaken."

*Id.* at 5, 78 S.Ct. at 518.

A "rule of reason" analysis is employed when the restraint in question is not so obviously anticompetitive as to be deemed *per se* unreasonable. This approach includes consideration of the facts peculiar to the business in which the restraint is applied, the purpose of the restraint and its effects, and the history of the restraint and the reason for its adoption. *Chicago Board of Trade v. U.S.*, 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918).

Apart from the antitrust merits in this matter, an issue also exists concerning the irreparability of the harm plaintiffs will suffer if an injunction is not issued.

#### I. *Standing*

■ Defendants argue that, even if plaintiffs can prove the elements of their claims and prove irreparable injury, the application for injunctive relief must be denied because plaintiffs lack standing to bring their present antitrust claims. De-

---

**15.** Section one of the Sherman Act provides, in relevant part:

  Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states, or with foreign nations, is declared to be illegal....

  15 U.S.C. § 1.

fendants' Brief, p. 13. This argument is rejected.

Generally speaking, a private plaintiff seeking injunctive relief must show a threat of "injury of the type the antitrust laws were intended to prevent and that flows from that which makes the [practice] ... unlawful." *Cargill v. Monfort of Colorado, Inc.*, 479 U.S. 104, 109, 107 S.Ct. 484, 489, 93 L.Ed.2d 427 (1986); *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977). In this case, plaintiffs assert they have suffered the loss of business opportunities flowing from conduct of the defendants aimed at eliminating competition. Defendants have argued broadly that plaintiffs must be the proper party to seek relief. *Cargill*, 479 U.S. at 110, n. 5, 107 S.Ct. at 489 n. 5 (citing *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983)). The antitrust laws are designed to protect competition, not a particular competitor. *Brunswick*, 429 U.S. at 488, 97 S.Ct. at 697; *Brown Shoe Co. v. United States*, 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962).

Defendants cite several cases for the proposition that, where a plaintiff fails to show a proscribed effect upon competition, courts consistently deny standing to assert a claim under the antitrust laws. The Third Circuit addressed the issue of antitrust standing in *Gregory Marketing Corp. v. Wakefern Food Corp.*, 787 F.2d 92 (3d Cir.), *cert. denied*, 479 U.S. 821, 107 S.Ct. 87, 93 L.Ed.2d 40 (1986). Standing was found not to exist in that case because the plaintiff was "neither a consumer nor a competitor in the ... market, and thus not within the area of the economy endangered by the breakdown of competitive conditions." *Id.* at 95.

Under the foregoing authority, plaintiffs appear to have standing to assert the anti-trust claims in this case. Plaintiffs are claiming injury from the anticompetitive effect—the exclusion of plaintiffs as competitors to defendants in the sale of Reese Foods products—that the antitrust laws are intended to prevent. Plaintiffs, moreover, have cited several cases finding that standing exists when antitrust plaintiffs are directly injured by the anticompetitive behavior of their competitors. *See, e.g., Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985); *Klors v. Broadway–Hale Stores*, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959); *USA Petroleum Co. v. Atlantic Richfield Co.*, 859 F.2d 687 (9th Cir.1988); *Pa. Dental Ass'n v. Medical Service Ass'n of Pa.*, 815 F.2d 270 (3d Cir.1987), *cert. denied*, —— U.S. ——, 108 S.Ct. 153, 98 L.Ed.2d 109 (1987); *Englert v. City of McKeesport*, 640 F.Supp. 1329 (W.D.Pa.1986).

## II. *The Relevant Market*

■ Before considering the merits of certain of plaintiffs' antitrust claims,[16] the relevant product and geographic markets by which to judge the alleged violations of the Sherman Act must be determined. *Brown Shoe Co., Inc. v. United States*, 370 U.S. 294, 324, 82 S.Ct. 1502, 1523, 8 L.Ed.2d 510 (1962); *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391–93, 76 S.Ct. 994, 1005–06, 100 L.Ed. 1264 (1956); *Fleer Corp. v. Topps Chewing Gum, Inc.*, 658 F.2d 139, 145 (3d Cir.1981), *cert. denied*, 455 U.S. 1019, 102 S.Ct. 1715, 72 L.Ed.2d 137 (1982); *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 268 (2d Cir.1979); *Hudson's Bay Co. v. American Legend Cooperative*, 651 F.Supp. 819, 834 (D.N.J.1986). In this regard "[t]he search for 'the relevant market[s]' must be undertaken and pursued with relentless clarity." *United States v. Grinnell Corp.*, 384 U.S. 563, 587, 86 S.Ct. 1698, 1712, 16 L.Ed.2d 778 (1966) (Fortas, Jr. dissenting).

**16.** Plaintiffs have claimed that the defendants have violated the Sherman Act by (1) agreeing to divide up territories on a horizontal basis and by (2) enforcing a group boycott against the plaintiffs. While it does not appear the success of plaintiffs' first claim necessarily depends upon the existence of dominant market power in various Reese Foods products, the success of the group boycott claim, under recent Supreme Court authority, would appear to require either market power in, or uniqueness of, various food products.

The burden to establish the relevant markets is ordinarily on the plaintiffs. *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172, 177–78, 86 S.Ct. 347, 350–51, 15 L.Ed.2d 247 (1965); *Neumann v. Reinforced Earth Co.*, 786 F.2d 424, 429 (D.C.Cir.), *cert. denied*, 479 U.S. 851, 107 S.Ct. 181, 93 L.Ed. 2d 116 (1986); *American Bearing Co., Inc. v. Litton Industries, Inc.*, 729 F.2d 943, 949 (3d Cir.), *cert. denied*, 469 U.S. 854, 105 S.Ct. 178, 83 L.Ed.2d 112 (1984).

A product market will be broader where there are viable substitutes for the product in question and will be narrower where the product is unique or cannot be substituted. The broader the product market (and the greater the number of competitors) the less defendants are apt to have a dominant market position in it. Accordingly, the defendants in antitrust suits invariably argue that the products in question are not unique and have many substitutes.

The importance of evaluating both reasonable interchangeability of use and "cross-elasticity of demand" of various specialty food products produced in the United States and elsewhere, in the delineation of the relevant product market, has been established. *Brown Shoe Company*, 370 U.S. at 325, 82 S.Ct. at 1523–24. In this context, "... 'reasonable interchangeability of use or the cross-elasticity of demand,' determines the boundaries of a product market." *Grinnell Corp.*, 384 U.S. at 592–93, 86 S.Ct. at 1715 (Fortas, J., dissenting). In determining the cross-elasticity of demand and interchangeability of use among various food products, the responsiveness of the sales of one product to price changes or supply of another must be weighed. *See, Smithkline Corp. v. Eli Lilly & Co.*, 427 F.Supp. 1089, 1115 (E.D.Pa.1976).

The availability of supply (of interchangeable goods) from various suppliers is a restraint on any producer of an item from increasing prices above the competitive level. Accordingly, as mentioned, the definition of a relevant market is based upon a determination of available substitutes.

To define a market in product and geographic terms is to say that if prices were appreciably raised or volume appreciably curtailed for the product within a given area, while demand held constant, supply from other sources could not be expected to enter promptly enough and in large enough amounts to restore the old price or volume.

L. Sullivan, *Handbook of the Law of Antitrust*, § 12 at 41 (1977); *see also E.I. du Pont de Nemours & Co.*, 351 U.S. at 395, 76 S.Ct. at 1007. To measure the cross-elasticity of demand is to determine whether a similar product will be substituted for the product in question. Likewise, cross-elasticity of supply is based upon the capability of other production facilities to produce a substitute product. The likelihood that similar products or production facilities are to be included in a relevant market increases in direct proportion to the increase of cross-elasticity or interchangeability of use of these products or facilities.

In *Brown Shoe*, the Supreme Court spoke of the concept of submarkets within a relevant market. The Court identified "practical indicia" for delineation of submarkets. Such indicia include "industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes and specialized vendors." *Brown Shoe*, 370 U.S. at 325, 82 S.Ct. at 1524. In this case, little evidence was offered to establish the relevant markets.

On the issue of geographic markets, products of Reese Foods appear to be distributed primarily, if not exclusively, in the United States. While there has been no mention of distributors located overseas, however, Fressie did indicate that as part of his effort to promote the Reese Foods line he attended certain international food shows.

On the issue of relevant market, it is not possible to make any hard and fast conclusions on the limited record in this case, which involves in excess of 500 individual products. If the outcome of this case de-

pended upon the application of group boycott precedents (which, as discussed, requires certain market power or uniqueness with respect to a product before *per se* rules apply), it would have probably been necessary to conduct an evidentiary hearing into the characteristics of various Reese Foods products. A more detailed record would have to be developed if plaintiffs depended upon the boycott authorities.

As to certain products (i.e., artichokes, cooking wines, capers and pasta), however, there has been significant evidence offered which tends to suggest the relevant product market is narrow because Reese Foods has unique packaging, customer loyalty and other characteristics. As indicated, several specialty food distributors, including some of the defendants, have stated in affidavits they need access to Reese Foods products because customers will accept no substitutes. Fressie analogized the difficulty of obtaining limited shelf space (at a grocery store) for alternative pastas (and other products) to the difficulty one would have in convincing a retailer to carry Fressie's coffee rather than Maxwell House coffee. He stated that, because of customer loyalty and recognition, the retailer would not accept Fressie's coffee *at any price*. Fressie Reply Cert., ¶ 5. Based on the affidavits supplied by several apparently disinterested specialty food distributors, which were largely uncontradicted, it appears that Reese Foods is a market force in at least certain products.

### III. *Horizontal Restraints on Trade*

Plaintiffs argue the defendants have illegally agreed to restrict competition in the sale of Reese Foods products. As discussed, no Reese Foods distributor is permitted to sell to either wholesalers or to retail chain warehouses outside of the assigned territory. Fressie Aff. ¶ 21; Bennett Certification ¶ 44. Plaintiffs argue the defendants' practices, allegedly horizontal in nature, are illegal *per se.*

■ On the threshold issue of whether the structure in this case is horizontal or vertical, plaintiffs argue the individual defendants, who are all involved in the distribution of food products at the same level, are also the present directors of Reese Foods. They control a voting trust of a majority of Reese Foods shares. Plaintiffs contend defendants, through Beers, their appointed chief executive officer,[17] have control over every aspect of Reese Foods' business. In short, plaintiffs assert Reese Foods is simply an "instrumentality" of the defendants. Plaintiffs' Br., p. 21.

Defendants, on the other hand, argue the structure and restrictions in this case are vertical in nature. It is noted Reese Foods does not itself compete as a distributor of any specialty food products. Rather, it is argued, Reese Foods is a supplier of specialty food products to a variety of distributors, many of which happen to be the shareholders and founders of Reese Foods. It is asserted day-to-day operations and management decisions of Reese Foods are made by Beers, its chief executive, who is neither a Reese Foods shareholder nor a competitor of the individual distributors.

Finally, defendants argue that, in his seventeen years of active participation in Reese Foods, Fressie has never functioned as a Reese Foods distributor to retail outlets. Arguing this case does not involve termination of "an existing dealership," defendants emphasize plaintiffs have never distributed Reese Foods products for their own account.[18] Asserting the restrictive

---

**17.** Plaintiffs argue that Beers, as the CEO, was simply hired to carry out the policies and directives of the horizontal competitors which comprise the Reese Foods Board of Directors. Complaint ¶ 38; Bennett Certification ¶ 38. The minutes of the March 21, 1988 Steering Committee meeting attached to Beers' affidavit state the reason Beers was selected to replace Fressie as Reese Foods' CEO was to insure: (i) "the company will be accountable to the stockholders rather than the environment now where [Mr. Fres-

sie] runs things the way he wants to;" and (ii) "[the company] is responsive to the distributors." *Id.*

**18.** Fressie vigorously refutes the suggestion he has never functioned as a Reese Foods distributor. While he declined full distributorship status when he had his responsibilities and salary as CEO of Reese Foods, Fressie states that for approximately the past ten years, Bascom Food has sold Reese Foods products to specialty foods retail distributors in the New York metropolitan

practices alleged by the plaintiffs are non-price distribution restraints, defendants argue the Supreme Court has made clear that all non-price *vertical* distribution restrictions are analyzed according to the rule of reason, rather than the *per se* rules of illegality (citing *GTE Sylvania, supra,* 433 U.S. at 59, 97 S.Ct. at 2562). For the following reasons, however, this case appears to involve restraints which are horizontal in nature.

This issue of horizontal restraints has been previously addressed by the Supreme Court. In *United States v. Sealy,* 388 U.S. 350, 87 S.Ct. 1847, 18 L.Ed.2d 1238 (1967), manufacturers of mattresses were licensed by Sealy to produce and sell products using the Sealy trademark. Sealy was owned *almost entirely* by its licensees who elected the board of directors and in fact controlled the business. Sealy agreed with its licensees not to license other manufacturers or sellers to sell Sealy-brand products in allocated territories in exchange for the promise of each licensee who sold in that territory not to expand beyond the area designated by Sealy. This was held to be a horizontal restraint, a *per se* violation of the Sherman Act.

On the issue of whether the arrangement was horizontal or vertical, the court explained:

> The territorial arrangements must be regarded as the creature of horizontal action by the licensees. It would violate reality to treat them as equivalent to territorial limitations imposed by a manufacturer upon independent dealers as incident to the sale of a trademarked product. *Sealy, Inc. is an instrumentality of the licensees for purposes of the hori-*

*zontal territorial allocation. It is not the principal.*

388 U.S. at 354 (emphasis added). The Court emphasized "Sealy was a joint venture of, by and for its stockholder-licensees ... and [they] are themselves directly, without even the semblance of insulation, in charge of Sealy's operations." *Id.; see also United States v. Topco Associates,* 405 U.S. 596, 608, 92 S.Ct. 1126, 1134, 31 L.Ed.2d 515 (1972).

Plaintiffs argue Reese Foods, like Sealy, Inc., is simply an instrumentality of its shareholders. The shareholders, through the individual defendants' exercise of the power of the voting trust, have elected a new board of directors who are themselves competing Reese Foods distributors. In light of *Sealy,* the defendants' formalistic argument that Reese Foods (a mere "instrumentality" of the defendants) itself does not compete with the individual distributors is rejected.

A more interesting question perhaps arises in light of the fact that Reese Foods has departed from its policy of only granting distributorships to the shareholders. It used to be the case that only shareholders were distributors, and all of them were. Currently, there are about ten distributors who do not own stock in Reese Foods. On the other hand, it appears that, with limited exceptions such as Fressie, all of the shareholders continue to be full line distributors of Reese Foods products. Indeed, as indicated above, the intention to distribute Reese Foods products is the only apparent reason to invest in Reese Foods.

The reason why the Supreme Court in *Sealy* concluded the arrangement was horizontal was because the Sealy licensees owned substantially all [19] of Sealy's stock.

area and in other areas where adequate Reese Foods distributors could not be found. Bascom Food did this work for Reese Foods' account and turned the revenues over to Reese Foods. These sales, according to plaintiffs, have always been reflected in Reese Foods' gross sales. Fressie Reply Aff., ¶ 9.

**19.** Another interesting issue would arise in the case where the distributors or licensees (horizontal competitors) owned less than "substantially all" of the stock of the purported "instrumentality." Where the horizontal competitors

own all of the stock, they are one and the same with the licensor or cooperative entity and it must be concluded that no independent third party entity exists. Where lesser percentages of the stock are held by horizontal competitors, however, it begins to appear as though, at least to some degree, a bona fide third party exists which has an influence over the terms of the distribution arrangement, but which is not a horizontal competitor. In short, with less than complete ownership of the stock by horizontal

The point is that where the stock (or at least a significant portion of it) is not owned by independent third parties, it seems illogical to conclude that there exists a true vertical distribution arrangement, with arms-length sales of goods being made down the line of distribution.

As in *Sealy*, virtually all of the stock of Reese Foods is owned by the Reese Foods distributors. The fact which defendants appear to emphasize (although without any reasoned discussion of the rationale in *Sealy*) is that there now exists a substantial number of distributors who do not own stock in Reese Foods. This fact, however, does not suffice to convert the arrangement in this case to a vertical one. As to the distributors who do not own any stock in Reese Foods, the arrangement may well be characterized as vertical because these distributors are truly being supplied Reese Foods products by an independent third-party entity, over which they have no con-

trol. These entities, however, are not named as defendants in this lawsuit. As to the shareholder defendants who are also distributors, the arrangement appears decidedly horizontal. These defendants, through their completely controlled instrumentality Reese Foods, appear to have eliminated competition at one level.

■ Because it appears the arrangement among the parties in this case is horizontal, the next inquiry is whether the restraint involved here should be treated under the *per se* rule or under the rule of reason.[20] It is argued by plaintiffs that the facts of this case are essentially identical to the facts in *Topco, supra*. The *Topco* Court held horizontal anticompetitive conduct (involving the division of customer territories), like that engaged in by defendants, to be *per se* unlawful under section one of the Sherman Act.

Topco Assoc., Inc. ("Topco Associates") was a cooperative association of approxi-

---

competitors, the arrangement begins to develop vertical characteristics.

An analogy to the antitrust doctrine articulated in *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984), might be made. While *Copperweld* held that parent corporations and *wholly-owned* subsidiaries (which have complete "unities of interest") are to be considered one and the same party for purposes of the two person requirement for a conspiracy, the Court specifically declined to address whether less than wholly-owned subsidiaries would be deemed to have similar "unities of interest." As in *Copperweld*, the issue here is whether Reese Foods should be considered one and the same as the individual distributors, with all parties sharing a "unity of interest."

Since *Copperweld*, there has not been a conclusive answer to the question: To what extent do dilutions in percentage ownership of a subsidiary cause one to conclude there is no longer a unity of interest? *Compare Magnum Force Distribs. v. Bon Bon Co. of Am.*, No. 84–2629 (E.D.N.Y. Nov. 9, 1984) (holding, without discussion, that a parent and its 60% owned subsidiary were incapable of conspiring) *with* Comment, *The Intra-Enterprise Conspiracy Doctrine After Copperweld Corp. v. Independence Tube Corp.*, 86 Colum.L.Rev. 198 (1986) (criticizing *Magnum Force* and arguing that a parent corporation and less than wholly-owned subsidiaries should not necessarily be viewed as one economic entity, and that a case by case approach should be adopted to determine whether parent companies and partially owned subsidiaries have a complete unity of interest).

It appears that when a parent company owns less than all of the stock of a subsidiary, a closer examination must be made to determine whether a unity of interest exists. Similarly, it is suggested here that, in assessing whether an arrangement is vertical or horizontal, it is necessary to look more closely at *Sealy*-type entities when they are not entirely, or almost entirely, owned by the alleged horizontal competitors. An examination must be made, in particular, into whether an entity other than a horizontal competitor (or its affiliates) owns enough of the stock of the *Sealy*-type entity and actually exercises significant control over the terms of distribution.

20. As indicated, plaintiffs argue the real motive for defendants' refusal to allow them to sell Reese Foods products is to prevent them from competing against defendants in the sale of Reese Foods products. It is alleged retailers and consumers are deprived of Reese Foods products at competitive prices because of defendants' horizontal agreements.

To the extent it is concluded defendants' conduct in this case is governed by a *per se* analysis, an inquiry into their purported good motives would not be necessary. A brief discussion of the antitrust merits of this case under a rule of reason analysis is nonetheless set forth below. It is suggested that, if a rule of reason analysis were to be conclusive, further evidence would have to be adduced concerning, among other things, the need to enforce the territorial restrictions in a way that precludes Fressie from selling any Reese Foods products.

mately twenty-five small and medium sized regional supermarkets. Topco Associates, like Reese Foods, was owned and operated by its members. The member firms, apart from their affiliation with Topco Associates, were wholly independent, separate supermarket chains, each operating under independent management. The basic function of Topco Associates was to serve as a purchasing agent for its members. Topco Associates procured and distributed high quality merchandise under private labels which it sold to its members. Topco Associates did not itself own any manufacturing, processing or warehousing facilities. The board of directors, which controlled the operation of the association, was drawn from the members and elected the association's officers, including its CEO. 405 U.S. at 598–99.

In an action brought by the United States for injunctive relief against alleged violation by Topco Associates of section one of the Sherman Act, the Government alleged that there existed:

> a continuing agreement, understanding and concert of action among the co-conspirator member firms acting through Topco, the substantial terms of which have been and are that each co-conspirator or member firm will sell Topco-controlled brands only within the marketing territory allocated to it, and will refrain from selling Topco-controlled brands outside such marketing territory.

405 U.S. at 601, 92 S.Ct. at 1130.

The Supreme Court stated:

> One of the classic examples of a per se violation of § 1 is an agreement between competitors at the same level of the market structure to allocate territories in order to minimize competition. Such concerted action is usually termed a "horizontal" restraint, in contradistinction to combinations of persons at different levels of the market structure, e.g., manufacturers and distributors, which are termed "vertical" restraints. This Court reiterated time and time again that "[h]orizontal territorial limitations ... are naked restraints of trade with no purpose except stifling of competition."

*White Motor Co. v. United States,* 372 U.S. 253, 263 9 L.Ed.2d 738, 746, 83 S.Ct. 696 [702] (1963). Such limitations are *per se* violations of the Sherman Act. 405 U.S. at 608, 92 S.Ct. at 1133–34 (other citations omitted). The Supreme Court held:

> We think that it is clear that the restraint in this case is a horizontal one, and, therefore, a *per se* violation of § 1.

*Id.* The Court rejected the defendants' attempts to justify the restrictions, holding that they were illegal *per se,* and that purported benefits to competition would not be considered.

Apparently because it would be unavailing to try to distinguish *Topco* on the facts, the defendants have argued that it is essentially outdated precedent. Defendants argue that the rule of reason is the prevailing standard of analysis today and cite *GTE Sylvania, supra,* 433 U.S. at 49, 97 S.Ct. at 2557 (approving non-price *vertical* restraints under the rule of reason where restrictions on intrabrand competition were beneficially offset by promotion of interbrand competition). Defendants have also cited cases involving horizontal arrangements which were treated under the rule of reason analysis.

In *National Collegiate Athletic Assoc. v. Board of Regents of Univ. of Oklahoma,* 468 U.S. 85, 104 S.Ct. 2948, 82 L.Ed. 2d 70 (1984) member associations, by their participation in an association which prevented them from competing against each other on the basis of price or kind of television rights which could be offered to broadcasters, created a horizontal restraint—an agreement among competitors on the way in which they would compete with one another. The *per se* rule was held inapplicable because more in-depth analysis was required to determine whether restraints on the number of NCAA football games were essential for the joint product (televised college football games) to be offered at all. *See also BMI v. Columbia Broadcasting System, Inc.,* 441 U.S. 1, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979) (blanket licensing fees not *per se* unlawful pricefix-

ing because of the efficiency benefits the cooperative venture offered).[21]

These cases, which did involve horizontal restrictions among competitors, depended on the fact that a new product was being offered pursuant to a restrictive arrangement, or that a product would probably not exist in the same form without the horizontal arrangement. No such new product flows from the arrangement between Reese Foods and the individual defendants. Defendants have argued that Reese Foods, through its distributor network, provides consumers with an alternative high-quality specialty food line which has many substitutes. Defendants' Br., p. 6. It has not been demonstrated that various Reese Foods products would not be sold other than pursuant to the distribution restrictions.

While there does appear to be a trend toward treating certain horizontal arrangements under the rule of reason analysis, this case appears to be directly controlled by *Topco*. The horizontal cases cited by defendants in favor of a rule of reason approach—*BMI* and *NCAA*—cite *Topco* approvingly. The Supreme Court has never indicated an intent to overrule *Topco*. While one court has apparently questioned the continued viability of *Topco*,[22] the Supreme Court has recently provided an indication that *Topco* continues to be good law. Last term, the Court restated the well-established principle that:

> [A] horizontal agreement to divide territories is *per se* illegal.

*Business Electronics Corp. v. Sharp Electronics Corp.*, 485 U.S. 717, 108 S.Ct. 1515, 99 L.Ed.2d 808 (1988) and cited *Topco* as authority. To the extent the Supreme Court has ever intended to modify the breadth or application of *Topco*, a somewhat less encompassing restatement of the *Topco* principle would be expected. *See*

also *United States v. Cooperative Theatres of Ohio*, 845 F.2d 1367 (6th Cir.1988).

Defendants' attempt to lightly disregard Supreme Court authorities on point is rejected. Neither *Sealy* nor *Topco* have been held to be no longer applicable in this Circuit. Defendants' agreement to divide territories and to restrict competition with the assigned territories appears to be illegal *per se*.

■ Plaintiffs have also alleged defendants' practices constitute an illegal group boycott which should be treated as a *per se* violation of section one of the Sherman Act. The boycott is allegedly the means by which the defendants, who are food distributors at the same horizontal level of the specialty foods market, have enforced the allocation of territorial markets among themselves and have made unlawful agreements on terms and conditions for distributing Reese Foods specialty food products. Plaintiffs assert defendants are engaged in a classic group boycott of plaintiffs by enforcing these restraints and preventing plaintiffs from competing with defendants in the sale of Reese Foods products. Plaintiffs' Br., p. 1.

Group boycotts have historically been held to be among those categories of conduct deemed unreasonable *per se* because they are so likely to restrict competition without any offsetting efficiency gains. *See United States v. General Motors Corp.*, 384 U.S. 127, 145, 86 S.Ct. 1321, 1330, 16 L.Ed.2d 415 (1966). In *Klors v. Broadway—Hale Stores*, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959) the Supreme court applied the *per se* rule, explaining that:

> Group boycotts, or concerted refusals by traders to deal with other traders, have long been held to be in the forbidden cate-

---

**21.** In *BMI*, the Supreme Court recognized that the defendants were offering a product—the monitoring and enforcement against unauthorized copyright use—which would be difficult and expensive for the copyright owners to substitute if the defendants were prohibited from engaging in the cooperative practice.

**22.** *See Rothery Storage & Van Co., v. Atlas Van Lines*, 792 F.2d 210, 226 (D.C.Cir.1986), *cert. denied*, 479 U.S. 1033, 107 S.Ct. 880, 93 L.Ed.2d 834 (1987) (J. Bork) ("if *Topco* meant, as it seemed to, that the existence of a joint venture could not justify an agreement eliminating competition between the joint venturers, [those subsequent decisions] ... must be read as overruling *Topco* to that extent.").

gory. They have not been saved by allegations that they were reasonable in the specific circumstances, nor by a failure to show that they "fixed or regulated prices, parcelled out or limited production, or brought about a deterioration in quality."

*Id.* at 212, 79 S.Ct. at 709; *see also DeFilippo v. Ford Motor Co.*, 516 F.2d 1313 (3d Cir.), *cert. denied*, 423 U.S. 912, 96 S.Ct. 216, 46 L.Ed.2d 141 (1975) (defining a *per se* illegal group boycott as one in which there is a "purpose either to exclude a person or group from the market, or to accomplish some other anticompetitive objective, or both." (quoting *Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd.*, 416 F.2d 71, 76 (9th Cir. 1969), *cert. denied*, 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970)). *Id.* at 1318.

Defendants argue the rule of reason approach has been endorsed in recent cases involving certain concerted refusals to deal. *See, e.g., Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.*, 472 U.S. 284, 105 S.Ct. 2613, 86 L.Ed.2d 202 (1985). Noting that certain efficiencies might be obtained by forming a purchasing cooperative (from which the plaintiff was excluded), the Supreme Court explained that:

> Wholesale purchasing cooperatives such as Northwest are not a form of concerted activity characteristically likely to result in predominantly anticompetitive effects. Rather, such cooperative arrangements would seem to be designed to increase economic efficiency and render markets more, rather than less, competitive. The arrangement permits the participating retailers to achieve economies of scale in both the purchase and warehousing of wholesale supplies, and also ensures ready access to a stock of goods that might otherwise be unavailable on short notice.... [This allows members] to compete more effectively with large retailers.

472 U.S. at 295, 105 S.Ct. at 2620 (citations omitted). The Court did conclude, however, that *per se* treatment may be appropriate under certain circumstances, *i.e.*, if the plaintiff establishes that the coopera-tive possessed market power or that access to the cooperative is essential for effective competition because a unique product is involved. *Id.* at 296–97, 105 S.Ct. at 2620–21.

In this case Fressie has made a substantial showing (which, of course, is subject to further rebuttal at trial) that certain, if not all, Reese Foods products are unique and that he will be unable to effectively compete in the specialty food business, in several different product lines, without access to products distributed by Reese Foods. Defendants merely assert, without compelling support, that there are numerous substitutes for Reese Foods products, Beers Aff., ¶¶ 4, 6, and the wide array of competing substitutes demonstrates that the distributorship opportunities for plaintiffs are innumerable. Defendants' Br., p. 6.

Fressie, on the other hand, corroborates in detail his assertion that Reese Foods products are unique and necessary if he and Bascom Food are to compete effectively in the sale of specialty food products. It is asserted Reese Foods is a dominant line of uniquely branded specialty food items that is virtually impossible to replace. This alleged fact is attested to by not only Fressie, but also by non-party retailers and specialty food distributors who have filed certifications in this case.

Among the non-party businessmen in the specialty food industry who have submitted certifications in this matter, Joseph Michael of F & G Food Distributors has stated: "Reese products have done very well in our market. Their quality makes them attractive, particularly to our upper income consumers. *There are no adequate substitutes available* to me for some of the Reese product line, particularly Reese artichoke hearts and its cooking wines." Michael Cert., ¶ 3 (emphasis added). Similarly, Leo A. Dick, President of Leo A. Dick & Sons, has stated: *"[T]here are some Reese products which are virtually impossible to substitute* such as Honey Cins, devilled olives, and sassafras tea bags." Dick Cert., ¶ 2 (emphasis added). Mr. Koons another specialty foods businessman, tried to substitute other specialty food products

for those of Reese Foods, but found that these are not comparable and that many of his customers would not accept such products as a substitute for those sold by Reese. Koons Cert., ¶ 4.

As one of his primary examples of why plaintiffs cannot duplicate the Reese Foods' private label products (because in many instances they dominate the specialty food industry with a brand recognition, breadth of coverage and consumer loyalty), Fressie emphasises that DaVinci pasta is both unique and the most popular brand of imported Italian pasta in this country. The DaVinci brand name has supermarket authorizations, established customer loyalty and is sold exclusively through Reese Foods distributors. Each order allegedly takes approximately three months to fill. Because DaVinci pasta has brand name recognition and customer loyalty, it cannot be replaced by another brand. Fressie Reply Cert., ¶¶ 2–5. As far as artichoke hearts are concerned, Fressie states:

> I cannot market a "Bascom" Brand of artichoke hearts and compete with the defendants and the other Reese shareholders/distributors in the sale of Reese artichoke hearts. Supermarkets have a finite amount of shelf space. Warehouses, stockrooms and inventory management systems are set up to handle a finite number of products. Reese products have substantial good will in the form of brand loyalty, supermarket authorizations and warehouse and inventory clearances which would take anyone starting up a new private label line of products literally years and millions of dollars to achieve.

*Id.,* ¶ 3. In addition, Fressie claims:

> it would take me literally years of marketing effort to get my "Fressie" coffee on the supermarket shelves next to the "Maxwell House" coffee regardless of what price I would be willing to charge.

*Id.,* ¶ 5.

Fressie also claims, as a related concept, that in many other products such as smoked oysters and capers, Reese Foods is the "dominant market factor." Having spent his entire career in this line of products, plaintiffs assert Fressie is known throughout the industry as "Mr. Reese." Koons Cert., ¶ 6. It is claimed that if plaintiffs are denied access to these products, defendants will succeed in placing plaintiffs, as competitors, at a severe competitive disadvantage.

In light of the substantial allegations concerning the uniqueness of various Reese Foods products and the related market power held by the defendants in these product lines, this case appears to be covered by the exception articulated by the Supreme court (as *per se* unlawful refusals to deal) in *Northwest Wholesale Stationers, Inc.*[23] Even if, with respect to certain product lines, Reese Foods does not offer a truly unique product, plaintiffs note that the resource denied in an alleged group boycott does not have to be "indispensable" —only competitively significant. *See Associated Press v. United States,* 326 U.S. 1, 17–18, 65 S.Ct. 1416, 1423–24, 89 L.Ed. 2013 (1945).[24] While it is not critical to resolve whether this case involves a group boycott which should be considered under *per se* analysis (because it appears the facts in this case indicate an illegal division of market share by horizontal competitors, under *Topco*), it is noted that this case appears to constitute the type of boycott to be treated under *per se* analysis.

If this case were to be treated under a rule of reason analysis, it would be necessary to consider the nature of the restraint (non-price, territorial restrictions) and the

---

**23.** Several courts have indicated "classic" group boycotts remain subject to the *per se* rule. *See Zimmerman v. Pepsico, Inc.,* 836 F.2d 173, 183 (3d Cir.1988); *Charley's Taxi Radio Dispatch Corp. v. SIDA of Hawaii, Inc.,* 810 F.2d 869, 877–878 (9th Cir.1987); *Goss v. Memorial Hospital System,* 789 F.2d 353, 354–355 (5th Cir.1986); *Seaboard Supply Co. v. Congoleum Corp.,* 770 F.2d 367, 374 (3d Cir.1985).

**24.** As an additional argument why Reese Foods products are competitively significant, Fressie has explained that many customers will not buy non-Reese Foods products from a distributor who does not carry Reese Foods products as well. Some customers will prefer to deal with a single distributor which carries all product lines.

purported pro-competitive justification for it. The Supreme Court has previously considered the justifications for distributions restrictions in specified territories.

In *GTE Sylvania, supra,* the Supreme Court refused to extend *per se* illegality to verticle nonprice restraints. That case involved a manufacturer's termination of one dealer pursuant to an exclusive territory agreement with another. The Court further concluded that vertical nonprice restraints had not been shown to have such a " 'pernicious effect on competition' " and to be so " 'lack[ing] [in] . . . redeeming value' " as to justify *per se* illegality. *Id.,* 433 U.S. at 58, 97 S.Ct. at 2561, quoting *Northern Pacific R. Co. v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). The Court found that the territorial restrictions had real potential to stimulate *inter* brand competition, "the primary concern of antitrust law", 433 U.S. at 52, n. 19, 97 S.Ct. at 2558, n. 19. It explained:

> "[N]ew manufacturers and manufacturers entering new markets can use the restrictions in order to induce competent and aggressive retailers to make the kind of investment of capital and labor that is often required in the distribution of products unknown to the consumer. Established manufacturers can use them to induce retailers to engage in promotional activities or to provide service and repair facilities necessary to the efficient marketing of their products. Service and repair are vital for many products. . . . The availability and quality of such services affect a manufacturer's goodwill and the competitiveness of his product. Because the market imperfections such as the so-called 'free-rider' effect, these services might not be provided by retailers in a purely competitive situation, despite the fact that each retailer's benefit would be greater if all provided the services than if none did."

*Id.* at 55, 97 S.Ct. at 2560.

The Court observed that a rule of *per se* illegality for vertical nonprice restraints [25]

was not needed or effective to protect *intra* brand competition. As long as interbrand competition existed, that would provide a "significant check" on any attempt to exploit intrabrand market power. Further, the *per se* illegality of vertical restraints would create an artificial and perhaps undesirable incentive for manufacturers to integrate vertically. *Id.* at 57, n. 26, 97 S.Ct. at 2561, n. 26.

The nature of the restraints in this case (nonprice territory restrictions), as well as the asserted procompetitive justifications, are similar to those addressed by the Supreme Court in *GTE Sylvania.* The key difference between the cases is that *GTE Sylvania* involved vertical restrictions, and that was an important reason for applying the rule of reason analysis. If it is assumed merely for discussion purposes that the rule of reason applies in this case (which, as indicated above, is *not* the holding here), *GTE Sylvania* would provide persuasive guidance in analyzing the competitive impact of territory restrictions.

While Reese Foods customers may not need the extensive service and repair desired by the electronics customers in *GTE Sylvania,* it appears that vigorous advertising and promotion of specialty food products would indeed enhance *inter* brand competition. Before concluding (for discussion purposes) that the restrictions in this case promote *inter* brand competition more than they eliminate *intra* brand competition, however, it would probably be necessary to conduct evidentiary hearings to adduce certain evidence. First, if it were concluded after a hearing that certain Reese Foods products were so completely unique, it would appear as though there would exist no *inter* brand competition to be enhanced. As to such unique products, the territory restrictions would have the effect of eliminating *intra* brand competition and, perhaps, the only competition. If

**25.** *GTE Sylvania* noted an important distinction between vertical nonprice and vertical price restraints. There was support for the proposition that vertical price restraints reduce *inter*brand price competition because they " 'facilitate car-

telizing.' " *Id.* at 51, n. 18, 97 S.Ct. at 2558, n. 18. There does not appear to be a similar danger of the cartel-facilitating effect resulting from vertical nonprice restraints.

this were the case, the rationale of *GTE Sylvania* would seem inapplicable and the restraints would be deemed unreasonable.

Second, it would perhaps be necessary to explore at trial the purported justifications for refusing to sell food products to the plaintiffs. While the territorial restrictions may be pro-competitive generally (at least as to some products), the exclusion of plaintiffs from the markets may have no legitimate justification whatsoever. It was suggested above that the reasons for terminating Fressie and Bascom Food appear pretextual. At trial it would perhaps be necessary to consider the reasons why Fressie should not be granted his own geographic territory, assuming territorial restrictions were upheld under the rule of reason.

## IV. *Irreparable Harm*

■ Before preliminary injunctive relief will be issued, plaintiffs must demonstrate they will suffer irreparable harm without it. The Third Circuit has consistently held that preliminary injunctive relief is not available where money damages are adequate to compensate the injured party. *See Frank's GMC Truck Center, Inc. v. General Motors Corp.*, 847 F.2d 100, 102–03 (3d Cir.1988); *In re Arthur Treacher's Francisee Litigation*, 689 F.2d 1137, 1146–47 (3d Cir.1982).

In *Frank's GMC*, a case not arising under the antitrust laws,[26] the plaintiff had been a GM franchisee for fifty years and had been a "full line" distributor for fifteen years. It had a substantial history as a distributor which is apparently what made it possible to calculate the amount of future lost profits attributable to its discontinuance as a heavy-duty truck distributor. The Third Circuit concluded there was no irreparable harm where the terminated product accounted for 26.5% of gross profits. 847 F.2d at 102–03.

The Third Circuit noted the district court expressly doubted that there was irreparable harm, but nevertheless granted injunctive relief based on equitable considerations. The Third Circuit held this to be a clear error and an insufficient basis upon which to grant injunctive relief where the applicant had an adequate remedy at law, in that case money damages. 847 F.2d at 102 n. 3. In *Frank's GMC* the Third Circuit did not exclude from future consideration the possibility that, under certain circumstances, it would be difficult, or indeed impossible, to calculate the amount of lost profits.

Defendants have cited several cases where it was held that irreparable harm did not exist because a specific amount of lost revenues (measured as a percentage) could be calculated. *See Inland Printing Co. v. A.B. Dick Co.*, Bus. Franchise Guide (CCH) ¶ 8997 at 18,318 (W.D.Mo.1987) (no irreparable harm where sales represented approximately 20% of total sales and profits); *Crowley Beverage Co. v. Miller Brewing Co.*, Bus. Franchise Guide (CCH) ¶ 8383 at 15,368 (D.Minn.1985) (no irreparable injury where terminated products accounted for 45% of commercial sales); *O.M. Droney Beverage Co. v. Miller Brewing Co.*, 365 F.Supp. 1067, 1068–71 (D.Minn.1973) (no irreparable harm where sales of terminated

---

**26.** It has been suggested that *Frank's GMC* should not apply with full force in this case because this case involves antitrust issues, which are somehow of greater public concern. While the public interest is a factor to be considered in granting injunctive relief, *Arthur Treachers*, 689 F.2d at 1143, it has been stated that in determining whether to issue a preliminary injunction under the antitrust laws, "there is nothing exceptional by reason of the presence of antitrust elements; the normal principles of equity are applicable." *Amigo Gift Ass'n v. Executive Properties, Ltd.*, 588 F.Supp. 654, 657 (W.D.Mo.1984) (citing *Kay Instrument Sales Co. v. Haldex Aktiebolag*, 296 F.Supp. 578, 579 (S.D. N.Y.1968)).

It has been concluded that defendants' apparent conduct in this matter, if it can be proved at trial, constitutes a violation of the Sherman Act and asserted justifications for the conduct will not be considered under the rule of reason analysis. It is noted that the existence of a *per se* violation of the antitrust laws appears to bear on the other criteria (i.e., in addition to the likelihood of success on the merits) for a preliminary injunction. For example, on the issue of the public interest, discussed below, it is surely in the public interest to prevent *per se* violations of the law.

products represented a majority of distributor's business).

It is clear that under *Frank's GMC,* irreparable harm does not exist, from a monetary point of view, if the amount of lost revenues can be reduced to a dollar amount. Without attacking that unequivocal rule articulated in *Frank's GMC,* plaintiffs argue that ample authority (although none of it particularly recent) exists for concluding inestimatable harm exists in this case.

In *Bergen Drug Co. v. Parke, Davis & Co.,* 307 F.2d 725 (3d Cir.1962), the defendants terminated plaintiff as a distributor of defendant's drug products after plaintiff brought an antitrust action alleging discriminatory dealing and an attempt to monopolize. The Third Circuit concluded plaintiff's damages were incalculable. Recognizing that pharmacies prefer to deal with a full-line, full-service wholesaler who can meet all of their needs in one order, the Court stated:

> It would be impossible to estimate or compute plaintiff's damages for the loss of good will which it will suffer as a result of being unable to provide its retail customers with service at least equally as good as that furnished by other wholesalers who have a continuing access to defendant's products. Goods supplied to it by defendant are not otherwise available. ... But the record fails to show that plaintiff could purchase such products under the same terms that it had purchased them from defendant.

*Id.* at 728. Similarly, in *Jacobson & Co., Inc. v. Armstrong Cork Co.,* 548 F.2d 438 (2d Cir.1977), the Second Circuit affirmed the trial court's finding that:

> loss of the Armstrong line would jeopardize Jacobson's good will and create a risk of "immeasurable harm" should Jacobson's customers and potential customers turn to competitors who do sell Armstrong products. [The trial judge] also concluded that the competitive disadvantage at which Jacobson would be placed

were it unable to bid Armstrong products was neither calculable nor compensable in dollars and cents.

*Id.* at 444–445. The Second Circuit agreed that plaintiff presented ample evidence to show a threatened loss of good will and customers, both present and potential, neither of which could be rectified by monetary damages. *Id.*

In *Blackwelder Furniture Co. v. Seilig Manufacturing Co., Inc.,* 550 F.2d 189 (4th Cir.1977), the court explained:

> We view the trial court's finding that Blackwelder will suffer no irreparable harm (on the basis that any injury to it would be readily calculable and collectible) as clearly erroneous. *Blackwelder's past profits* [27] *on Seilig furniture afford a plausible basis for calculating some of the damages* from any wrongful termination. But not all. Word-of-mouth grumbling of customers can convert Blackwelder's inability to honor Seilig orders into a reputation for general unreliability as a merchant. ... The harm posed to Blackwelder's general goodwill by its inability to fill outstanding and accumulating orders in excess of $15,000 for furniture listed in its catalogues is incalculable—not incalculably great or small, just incalculable.

*Id.* at 196–97 (emphasis added). *See also Dominion Bankshares Corp. v. Devon Holding Co., Inc.,* 690 F.Supp. 338, 348 (E.D.Pa.1988) ("erosion of goodwill or of plaintiff's reputation can never accurately be ascertained or compensated by money damages"); *Hendricks Music Co. v. Steinway, Inc.,* 689 F.Supp. 1501, 1512 (N.D.Ill. 1988) ("Hendricks' entire business and reputation have been based on the prestige of the Steinway line. The loss of goodwill Hendricks will suffer if it must discontinue carrying that line is thus alone significant and impossible to quantify"); *Tully v. Mott Supermarkets, Inc.,* 337 F.Supp. 834, 851 (D.N.J.1972) ("This Court would find it virtually impossible to put a collective dollar and cent valuation on such items as lost

---

**27.** As discussed, neither Fressie nor Bascom Food have a lengthy history of operations which can be referred to in an attempt to measure the

loss of revenues due to the defendants' refusal to deal.

savings, customer loyalty and private "Shop–Rite" label.").

In this case, although Fressie has been closely involved with the promotion of Reese Foods products over a period of several years, he has never been a fully active distributor of Reese Foods products. Prior to oral argument, no suggestion had been offered as to how plaintiffs, if they succeed in proving their antitrust claims at trial, can prove the actual amount of damages suffered as a result of not cultivating a potential customer base. Also, it appears a victory at trial could be empty if damages are not calculable; at the time of trial the opportunity to do business may well be gone.

In an effort to demonstrate that damages can be calculated even without a prior sales history, defendants submitted—without leave from the court—a letter quoting from an Eighth Circuit opinion and attaching an article (Rulon, *Proof of Damages for Terminated or Precluded Plaintiffs*, 49 ABA ANtitrust Law Journal 153, 159–63 (Summer 1980) ("Rulon")) which discusses possible methods by which terminated or precluded plaintiffs can prove their damages. First, in *Central Telecommunications, Inc. v. TCI Cablevision, Inc.*, 800 F.2d 711, 727–732 (8th Cir.1986), *cert. denied*, 480 U.S. 910, 107 S.Ct. 1358, 94 L.Ed. 2d 528 (1987), the trial court held that the plaintiff, an unestablished business, unlawfully precluded from the market, was entitled to recover actual antitrust damages. The Court of Appeals affirmed, noting:

> * * * [a]t least seven of the Circuit Courts of Appeal, as well as numerous district courts, and the Supreme Court by implication have ruled that an unestablished business can recover future lost profits under the federal antitrust laws if a sufficiently advanced state of preparation for entering the market has been achieved.

*Id.* at 727–28. Defendants rely on the above passage as support for their position that plaintiffs, who have an adequate opportunity to prove actual damages at trial,

should not be granted injunctive relief. This is an unduly broad reading of *Central Telecommunications*, which did not involve the propriety of an injunction or discuss the issue of calculating damages (in terms of specific methods) in connection with the antitrust discussion.[28]

*Central Telecommunications* stands for the proposition that a plaintiff, if it has achieved a sufficiently advanced state of preparation for entering a market, may as a legal matter be entitled to recover anticipated profits. There is a difference between saying a precluded competitor is entitled to recover anticipated profits on the one hand and concluding that those damages are so readily calculable that an injunction should not be issued on the other hand.

*Central Telecommunications* quoted from *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969) where the Court held that antitrust damages could be awarded on the basis of plaintiff's estimates of sales it would have made absent the violation:

> [D]amage issues in these cases are rarely susceptible of the kind of concrete, detailed proof of injury which is available in other contexts. The Court has repeatedly held that in the absence of more precise proof, the fact-finder may "conclude as a matter of just and reasonable inference from the proof of defendants' wrongful acts and their tendency to injure plaintiffs' business, and from the evidence of the decline in prices, profits and values, not shown to be attributable to other causes, that defendants' wrongful acts had caused damage to the plaintiffs."

*Id.* at 123–24, 89 S.Ct. at 1576–77. That case, however, did not involve a brand new competitor which was precluded from a market. *Zenith Radio* does not support the argument that an injunction should not issue in this case because Fressie will have an adequate opportunity to approximate damages later.

---

**28.** The issue of proving damages, in particular those which were purported to be speculative, was discussed in connection with certain state law claims.

Second, defendants have submitted the above-mentioned article which purportedly demonstrates the availability of methods for proving damages, in the form of lost profits, suffered by terminated distributors. In fact, however, the article suggests that the two methods discussed are *not* easily applied to plaintiffs without operating histories. The author stated that:

> Going-concern [method (the first method of calculating damages)] is of little utility to a plaintiff who has been precluded from entering into a business. Lacking both an enterprise and a track record on which to base a valuation, a plaintiff in this predicament generally seeks to measure its damages by establishing the loss of anticipated or future profits occasioned by the antitrust violation.
>
> \* \* \* \* \* \*
>
> There are two generally recognized methods of proving loss of profits: (1) the "before and after" theory; and (2) the "yardstick" test. The "before and after" theory compares the plaintiff's profit record prior to the violation with its record after the violation. This method is of limited utility to a precluded or terminated plaintiff who has been prevented from compiling an earnings record sufficient to allow an estimation of his loss of profits. Plaintiffs in this situation sometimes turn to the "yardstick" test under which the earnings of the foreclosed or destroyed business are measured by the earnings realized by comparable businesses.[29] However, since the calculation of lost profits under this method is based on actual earnings, only profits lost between the time of the violation and the time of ultimate judg-

ment in the case can be recovered. This does not provide the terminated or precluded plaintiff with the full measure of damages he generally seeks, the profits that would have been forthcoming over the projected life of the business.

Rulon at 159–60 (footnotes omitted).

Plaintiffs here have no record of sales or profits from the active distribution of Reese Foods products to the retail class of trade from which an approximation of future lost sales or profits could be calculated or extrapolated. This case, in short, is distinguishable from *Frank's GMC* where there existed a fifteen year history of sales activities.

Moreover, on an issue somewhat distinct from the precise amount of lost sales, the case law affords injunctive relief to plaintiffs whose loss of consumer good will results in incalculable damage. In this case plaintiffs assert they will suffer an inestimable loss of good will as a result of their inability to purchase unique Reese Foods products from any other source. They will be unable to satisfy present and future customers' orders (the amount of which is not determinable without an operating history) for Reese Foods products. This denial of access to Reese Foods goods, and the resultant harm caused to plaintiffs, cannot be calculated or adequately compensated in money damages.

As to the existence of good will, although there is no specific customer list, Fressie asserts that he possesses vast knowledge of the market for Reese Foods specialty food products. For seventeen years, he has vigorously promoted the various Reese Foods brands and Reese Foods products.[30] He has travelled extensively,

---

29. Plaintiffs in this case have argued that there are not really comparable specialty food distributors of Reese Foods products. Fressie claims that he is "Mr. Reese" and that he has the most goodwill after devoting nearly two decades to promoting Reese Foods products.

30. Defendants have argued that, where a distributor sells a product for only a short time prior to its termination, the distributor's damages are not so uncertain as to constitute irreparable harm. (Citing *Jack Kahn Music v. Baldwin Piano & Organ Co.,* 604 F.2d 755, 759 (2d Cir.

1979) (dealership terminated after one and a half years; preliminary injunction denied because dealership had insufficient time to build up good will); *American Can Co. v. A.B. Dick,* Bus. Franchise Guide (CCH) ¶ 8097 (S.D.N.Y. 1983) (no good will accumulated by plaintiff after selling product for less than one month; preliminary injunction denied). Defendants' Brief, p. 10. In this case, however, Fressie has made a strong showing that he has been developing his good will in the Reese Foods products for several years.

both internationally and in this country, attending food shows, product demonstrations, conventions and countless other events to support and build up the Reese Foods line and Bascom Food's association with it. He has developed extensive and valuable contacts with suppliers and customers, both actual and potential, for Reese Foods products. If he is not permitted access to Reese Foods products, Fressie claims his suppliers and customers will dissipate, at incalculable cost to him and to his reputation in the specialty foods industry. Fressie Aff., ¶ 11.

It is recognized that the standard for demonstrating irreparable harm is a difficult one in the Third Circuit. *Frank's GMC* stands for the proposition that, without a demonstration of why losses cannot be calculated, irreparable harm does not exist. "[W]hat may constitute irreparable harm in a particular case is, of course, dependent upon the particular circumstances of the case." *Hohe v. Casey,* 868 F.2d 69, 71 (3d Cir.1989) (citing *Oburn v. Shapp,* 521 F.2d 142, 151 (3d Cir.1975)). It has been concluded that plaintiffs have demonstrated an inability to prove the likely amount of lost profits and that their good will would suffer in inestimable amounts.

Even if this case were not distinguishable from *Frank's GMC* on the foregoing basis, this case appears to involve a form of non-economic harm which some courts have recognized. Fressie had spent most of his working life in the specialty foods industry, with at least seventeen years being devoted to Reese Foods products in particular. Even if he could be *financially* compensated for the losses he would suffer from being expelled from his livelihood, he could not be relieved from the harm resulting from the potential destruction of his life's work.

While there may not exist Third Circuit precedent for preventing this type of irreparable injury, this case provides a compelling example of how not all things in life can be reduced to a dollar price. Even if the financial losses suffered by plaintiffs could be calculated in this case—although no persuasive suggestion has been made

how that could be done—a preliminary injunction should be issued pursuant to the thoughtful reasoning contained in an opinion written by Judge Friendly. He noted that, in a case involving the termination of an automobile dealer, "the right to continue a business in which William Semmes had engaged for twenty years and into which his son had recently entered is not measurable entirely in monetary terms; *the Semmes want to sell automobiles, not to live on the income from a damages award." Semmes Motors, Inc. v. Ford Motor Co.,* 429 F.2d 1197, 1205 (2d Cir. 1970) (emphasis added) (cited with approval in *Roland Machinery Co. v. Dresser Industries,* 749 F.2d 380, 386 (7th Cir.1984)).

On the issue of the public interest, the court explained in *Paschall v. K.C. Star Co.,* 441 F.Supp. 349 (W.D.Mo.1977) that:

Consideration of the public interest is particularly appropriate in the context of a private antitrust suit where injunctive relief is sought. In *Zenith Radio Corporation v. Hazeltine Research,* 395 U.S. 100, 130–31, 89 S.Ct. 1562, 1580, 23 L.Ed.2d 129, 152 (1969), it is declared:

[T]he purpose of giving private parties treble damages and injunctive remedies was not merely to provide private relief, but was to serve as well the high purpose of enforcing the antitrust laws.

If it should appear in the trial on the merits, that defendant has transgressed the federal antitrust laws, to term plaintiffs' injuries compensable in money and deny injunctive relief, thereby allowing continuation of violation of the antitrust laws would be highly inappropriate. While satisfying the pocketbook interests of the individual plaintiffs, it would do little to protect the public.

*Id.* at 359.

Finally, as far as the balancing of hardships is concerned, Reese Foods argues it will suffer serious injury if a preliminary injunction is ordered. It is claimed that the granting of the injunctive relief would upset Reese Foods' carefully developed distributorship policies and may very well result in injury to Reese Foods' sales and

product image. Apart from the fact the distribution policies have been in a state of change in recent years (a fact emphasized by defendants in another context), it does not appear to be plaintiffs' intent, or expectation, to harm the product image of Reese Foods.

Quite to the contrary, plaintiffs want access to Reese Food products to aggressively market and promote their sale to retail customers. Fressie Reply Aff., ¶ 17. As indicated, Fressie is so confident of his ability to market Reese Foods products that he has stated: "if, at the end of one year of free and open competition, Bascom is not buying and selling at least as much Reese product as the current lowest volume Reese distributor, [he] will surrender [his] shares to the corporation for nothing." Fressie Reply Aff. ¶ 27.[31]

Because denial of the injunction will result in an irreparable injury to plaintiffs' business opportunities and the granting of it would not cause similar hardship to the defendants, the balancing of the hardships in this case is tipped decidely in favor of the plaintiffs. Indeed, the absence of any demonstrable hardship to the defendants resulting from supplying Fressie his pro rata share of Reese Foods products is a significant (although not the compelling)

reason for granting injunctive relief pending an October, 1989 trial. Because plaintiffs will not be entitled to sell more than their appropriate percentage (based upon Fressie's percentage ownership of Reese Foods stock and the contractual commitments to non-shareholder/distributors) of specialty food products, defendants' argument that plaintiffs will destroy the Reese Foods name across the nation in the next five months is rejected.

*Conclusion*

Plaintiffs' request for affirmative injunctive relief is granted. Upon the posting of the bond set forth in footnote 31, Reese Foods (and, to the extent they exercise control over Reese Foods, the individual defendants) shall be required to supply plaintiffs a reasonable amount of Reese Foods products for resale by plaintiffs in any geographic area and to any class of customers. The "reasonable amount" of Reese Foods products to which plaintiffs will be entitled shall be determined, as indicated, with reference to Fressie's pro rata ownership of Reese Foods stock, the amount of products available and the amount of products committed by contract to non-shareholder distributors.

SO ORDERED.

---

**31.** Plaintiffs have offered to make this undertaking a condition to the issuance of an injunction. Rule 65(c) requires a party seeking a preliminary injunction to post a security bond for the limited purpose of protecting the enjoined party from damages incurred as a result of the wrongful issuance of an injunction. *Commerce Tankers v. National Maritime Union of America*, 553 F.2d 793 (2d Cir.), *cert. denied*, 434 U.S. 923, 98 S.Ct. 400, 54 L.Ed.2d 280 (1977). The amount of the bond is a matter within the discretion of the court. Similarly, the amount of damages awarded on a bond is discretionary, to be based on considerations of equity and justice. *Kansas v. Adams*, 705 F.2d 1267 (10th Cir.1983). Courts may dispense with a bond or require only nominal bonds under certain circumstances. Where statutes provide that private actions be brought in the public interest, minimal amounts are often set by the court. *Natural Resources Defense Council, Inc. v. Morton*, 337 F.Supp. 167 (D.D.C.1971) (suit to enjoin government under

National Environmental Policy Act—government asks bond of $750,000, bond set at $100).

While the record suggests that a share of Reese Foods stock (which, when Reese Foods was founded on August 20, 1971 Fressie paid "a few hundred dollars" for one share of stock) does not have a ready determinable value, there must be a way of determining the value. As indicated above, certain shareholders not complying with the shareholders agreement (i.e., Fien) have had their shares repurchased.

In addition to the foregoing undertaking, plaintiffs will also post a bond in the amount of $50,000. The amount of a possible bond has not been addressed by the parties. While the amount established hereby appears to be reasonable, either side may object to the amount by filing a brief on or before June 9, 1989, with responsive briefs to be filed on or before June 16, 1989. If necessary, oral argument will be had (on the issue of the amount of the bond) on June 20, 1989.

## APPENDIX A

| DESCRIPTION AND TRADEMARK | 1988 ESTIMATED YEARLY SALES BY TRADEMARK | 1989 ESTIMATED YEARLY SALES |
|---|---|---|
| Olives: | | |
| Athena: | 13,518.48 | 1,313,258.04 |
| Reese | 1,299,739.56 | |
| Mustards: | | |
| Bonapaste | 50,483.76 | 586,062.36 |
| Reese | 368,769.78 | |
| Ty Ling | 165,483.48 | |
| Moon Palace | 1,325.34 | |
| Mushrooms: | | |
| Bonapaste | 45,695.52 | 110,304.84 |
| Da Vinci | 31,099.20 | |
| Reese | 26,691.00 | |
| Ty Ling | 6,819.12 | |
| Meats, Snail, Paté: | | |
| Maurice | 232,812.30 | 267,054.06 |
| Reese | 34,241.76 | |
| Pastina, Box Pasta: | | |
| Da Vinci | 1,044,157.14 | 1,044,157.14 |
| Oils, Sauce, Wine Vin: | | |
| Da Vinci | 598,761.06 | 598,761.06 |
| Bread Prod.: | | |
| Da Vinci | 239,725.44 | 337,493.04 |
| Reese | 97,767.60 | |
| Pasta Long Cuts: | | |
| Da Vinci | 1,362,839.40 | 1,362,839.40 |
| Pasta Special Cuts: | | |
| Da Vinci | 2,250,680.04 | 2,250,680.04 |
| Tortellini Prod.: | | |
| Da Vinci | 3,201,155.10 | 3,201,155.10 |
| Nest Colored Pasta: | | |
| Da Vinci | 1,075,526.40 | 1,075,526.40 |
| Mexican Sauces: | | |
| El Rio | 3,069,283.62 | 3,069,283.62 |
| Mexican Bean Prod.: | | |
| El Rio | 583,403.64 | 583,403.64 |
| Mexican Seasoning: | | |
| El Rio | 412,206.24 | 412,206.24 |
| Mexican Refrig.Prod.: | | |
| El Rio | 717,632.16 | 717,632.16 |
| Mexican Peppers & Veg.: | | |
| El Rio | 622,080.60 | 622,080.60 |
| Mexican Shell Prod.: | | |
| El Rio | 221,770.62 | 221,770.62 |
| Mexican Prepared: | | |
| El Rio | 346,870.74 | 346,870.74 |
| Mexican Snacks: | | |
| El Rio | 139,277.94 | 139,277.94 |
| Mexican Nachos: | | |
| El Rio | 633,084.78 | 633,084.78 |
| Herring German: | | |
| Gunkel | 180,350.94 | 180,350.94 |
| Sauce Horseradish: | | |
| Hammonds | 73,795.62 | 2,029,304.88 |
| London Pub | 378,740.22 | |
| Reese | 1,576,769.04 | |
| Dry & Liquid Seas: | | |
| London Pub | 3,232.92 | 923,789.58 |
| Reese | 885,223.02 | |
| Ty Ling | 35,333.64 | |

| DESCRIPTION AND TRADEMARK | 1988 ESTIMATED YEARLY SALES BY TRADEMARK | 1989 ESTIMATED YEARLY SALES |
|---|---|---|
| Jellies, Chutney Sauces: | | |
| Reese | 360,679.08 | 520,649.88 |
| London Pub | 159,970.80 | |
| Specialty Veg.: | | |
| Athena | <1,723.50> | 2,877,653.10 |
| London Pub | 87,142.80 | |
| Reese | 2,792,233.80 | |
| Oriental Sauces: | | |
| Moon Palace | 6,710.22 | 1,086,290.88 |
| Reese | 104,861.88 | |
| Ty Ling | 974,718.78 | |
| Teas: | | |
| Moon Palace | 4,181.04 | 80,140.32 |
| Reese | 75,959.28 | |
| Granola, Natural: | | |
| Natural Life | 4,540.20 | 68,327.04 |
| Reese | 36,231.84 | |
| Sovex | 27,555.00 | |
| Vinegar: | | |
| Barengo | 8,116.20 | 515,328.78 |
| Reese | 470,918.76 | |
| Ty Ling | 36,293.82 | |
| Caviar: | | |
| Northland Queen | 72,472.20 | 128,755.62 |
| Reese | 56,283.42 | |
| Fish: | | |
| Northland Queen | 9,027.00 | 5,392,743.78 |
| Reese | 5,305,295.82 | |
| Ty Ling | 78,420.96 | |
| Cherries: | | |
| Reese | 244,558.62 | 244,558.62 |
| Cocktail Mix: | | |
| Reese | 2,376.00 | 2,376.00 |
| Oriental Specialties: | | |
| Reese | 10,309.50 | 325,498.50 |
| Ty Ling | 315,189.00 | |
| Swedish Pancake Mix: | | |
| Reese | 15,003.30 | 15,003.30 |
| Almond Paste: | | |
| Reese | 39,277.86 | 39,277.86 |
| Rice: | | |
| Reese | 499,226.16 | 499,226.16 |
| Snacks, Cookies: | | |
| Reese | 244,606.26 | 244,606.26 |
| Croutons: | | |
| Reese | 580,492.86 | 580,492.86 |
| Cooking Wines: | | |
| Reese | 933,421.38 | 933,421.38 |
| Non–Food Partyware: | | |
| Reese | 144,716.64 | 187,178.10 |
| Ty Ling | 42,461.46 | |
| Noodles, Tapioca: | | |
| Reese | 181,357.32 | 782,172.66 |
| Ty Ling | 68,407.89 | |
| Moon Palace | 190,368.00 | |
| Salad Dressing: | | |
| Reese | 95,626.92 | 95,626.92 |
| Soups: | | |
| Reese | 72,047.58 | 157,005.90 |
| Ty Ling | 84,958.32 | |

| DESCRIPTION AND TRADEMARK | 1988 ESTIMATED YEARLY SALES BY TRADEMARK | 1989 ESTIMATED YEARLY SALES |
|---|---|---|
| Syrups & Honey: | | |
| Reese | 312,730.92 | 312,730.92 |
| Fruits & Juices: | | |
| Reese | 163,586.64 | 170,400.36 |
| Ty Ling | 6,813.72 | |
| Peppers: | | |
| Reese | 244,935.96 | 244,935.96 |
| Pickles: | | |
| Reese | 126,072.48 | 126,072.48 |
| Artichokes: | | |
| Reese | 3,735,761.88 | 3,735,761.88 |
| Oriental Veg.: | | |
| Reese | 528,121.74 | 636,272.52 |
| Ty Ling | 108,150.78 | |
| Oriental Rice Crunch: | | |
| Ty Ling | 119,959.74 | 119,959.74 |